State of Minnesota ex rel.      )
Northern Pacific Center, Inc.;  )
and Northern Pacific Center, Inc. )
                                )
    v.                          )    ORDER
                                )
BNSF Railway Company            )


This case presents an unusual, interesting, and unresolved question: Is an admitted polluter, which has, at the direction of a state's environmental protection agency completed environmental remediation, required to perform a subsequent and more stringent remediation if the agency later raises its standards?

Defendant, BNSF Railway Company ("BNSF") once owned and operated a railroad maintenance shop in Brainerd, Minnesota. At that facility, BNSF used products which contaminated the soil, turning it into a "brownfield," as such properties are known. BNSF sold the property in 1983, but remained responsible for the contamination under the Minnesota Environmental Response and Liability Act ("MERLA"), Minn. Stat. § 115B.01-51 (2008).

In the late 1980s and early 1990s, BNSF worked with the Minnesota Pollution Control Agency (the "Agency," or the "MPCA") to establish parameters for environmental cleanup. In 1995, BNSF and the Agency agreed a limit of 1,400 parts per million

("ppm")[1] was acceptable for lead contamination in the soil. After notice and comment, the Agency published a Decision Document in July 2001 adopting that level. Shortly thereafter, BNSF conducted its cleanup.

When plaintiff, the current property owner, wanted to redevelop the site, it discovered the Agency had changed its mind, and now required all excavated soil be remediated to 700 ppm. Plaintiff complied with this requirement, and reduced the lead levels to meet the new standard. Plaintiff now seeks to recover the costs of this additional cleanup from BNSF.

BNSF moves for summary judgment, arguing the costs can no longer be recovered. Its motion is granted in part and denied in part.

I. Background

As required on a motion for summary judgment, the facts are taken in the light most favorable to plaintiff, the non-moving party.

For nearly 100 years, ending in 1983, BNSF owned a 102.5 acre parcel in Brainerd, Minnesota. Until 1977, it used the property to repair and maintain railroad cars. The southern part of the property -- approximately 47 acres known as the "Brainerd Car

---

[1] The evidence submitted in connection with the motion refers to both parts per million ("ppm") and milligrams/kilograms ("mg/kg"). More recent documents use mg/kg, as preferred by the International System of Units. As the measures of concentration are interchangeable, the Court uses "parts per million."

Shops" -- housed, among other things, a coal burning power plant, an acetylene gas plant, a diesel refueling tank, underground oil storage tanks, and a railroad car cleaning facility. BNSF sold the Brainerd Car Shops in 1983; it still owns the remainder of the parcel.

In May 1985, the Agency began investigating the Brainerd Car Shops property. In 1987, contractors working for the U.S. Environmental Protection Agency inspected the site and found hazardous substance contamination in the soil. In 1988, the Agency asked BNSF to conduct a Phase I Remedial Investigation. The investigation identified likely sources of contamination, including fly ash from the power plant, lime waste from the acetylene gas plant, hydrocarbons, lead, and asbestos.

In December 1988, the Agency designated the property a Minnesota Superfund Site, and asked BNSF to conduct a Phase II Remedial Investigation to address the contaminants found in Phase I. Again, BNSF complied. The Phase II report, completed in 1990, identified areas with high levels of lead. During the course of these investigations, the property changed hands several times. The transfers ended in 1992, when plaintiff, after reviewing the Agency's files, purchased the property.

Meanwhile, BNSF prepared a risk assessment and worked with the Agency to develop target levels for remediation. In February 1995, the Agency proposed that lead be remediated to a level of 1,400 ppm

3

in the top five feet of soil, and 2,500 ppm for the five feet below. In April 1995, after a public hearing attended by one of plaintiff's principals, the Agency adopted the proposed standards, and indicated the property should be restricted to commercial and industrial use. Based on the adopted standards, BNSF, through its environmental consultants, developed a plan to clean up the contamination. Plaintiff received a copy of the cleanup plan.

On June 6, 1996, one of plaintiff's principals wrote to the Agency objecting to the adopted lead remediation standards. In April 1997, he wrote to BNSF urging it to opt for more remediation than the Agency required. If accomplished, the lower lead levels would allow plaintiff unrestricted use of the property. BNSF declined to do so. The Agency approved BNSF's work plan in December 1999.

Over the course of the site remediation, the Agency changed its pollution evaluation methodology. The new method, outlined in a "Risk-Based Site Evaluation Manual,"[2] called for a lead contaminant's "industrial soil reference value" to be 700 ppm. (See Heebner Aff. Ex. 5 at 15-16.) It appears the Agency adopted these risk-based guidelines in late 1998 or early 1999.

---

[2] Proposed in 1998, the Manual appears to remain a working draft on the MPCA website. See Risk-based Site Evaluation Process Guidance Documents, available online at http://www.pca.state.mn.us/cleanup/riskbasedoc.html (last visited June 21, 2010).

Nonetheless, the Agency maintained its previously-adopted standard of 1,400 ppm for the Brainerd Car Shops site. The Agency wrote to plaintiff on April 7, 2000, stating the 1,400 ppm level "will remain in effect permanently," and "there would be no need for further soil remediation at this site." (Heebner Aff. Ex. 6.) The letter was explicit:

> The MPCA considers this cleanup plan to be final, and additional soil remediation of the contamination attributable to BNSF will not be necessary unless new wastes or contamination of soils attributable to BNSF above the above described cleanup levels are discovered. If the property owner chooses to change the use of the property from commercial, industrial, or multi-family housing purposes, the property owner may be responsible for additional cleanup to meet the standards required for the new use.

(Id.)

On July 9, 2001, the Agency issued a Minnesota Decision Document which "present[ed] the selected remedial action and cleanup levels" for the site. (See Affidavit of Kristen Heebner, Ex. 7, at 1, 5 (hereafter "Decision Document" or "MDD")). The Decision Document identified BNSF as the sole "responsible party" for the lead contamination in the soil, and stated it "does not release BNSF from future liability for contaminated soils at the Site." It formally adopted standards establishing 1,400 ppm for cleanup of the upper five feet of soil, and 2,500 ppm for the five feet below. The parties dispute whether the Decision Document applied to the entire 102.5 acre site, or only specific areas

5

within the site.[3] But as the Court decides the motion on another ground, it need not resolve this question.

In the fall of 2001, BNSF remediated the lead contaminated soil to the standard required by the Decision Document. Plaintiff was informed of all progress and test results. Meanwhile, plaintiff and the City of Brainerd conducted an independent investigation to assure lead levels were appropriate for planned redevelopment. All samples showed lead levels of 1,400 ppm or below, consistent with the Decision Document.

Plaintiff then decided to begin redevelopment of the property. Plaintiff had previously enrolled the property in the Agency's Voluntary Investigation and Cleanup program, which facilitates cleanup and redevelopment of brownfields by persons other than the "responsible parties" under MERLA. As part of that program, plaintiff proposed an environmental contingency plan to deal with lead contaminated soil disturbed by any future construction.

Construction began in the summer of 2002, when the City of Brainerd built a road and installed utilities on the land. Plaintiff proposed to the Agency that all excavated soil with lead

---

[3] The Agency has, helpfully, landed squarely on both sides of the issue: compare its April 7, 2000 letter, see Heebner Aff. Ex. 6 ("The cleanup levels described above apply to the entire site"), and the 2009 amended Decision Document, see id. Ex. 27 at 2 ("The 2001 MDD established clean up goals and approved response actions for the lead-contaminated soil at the roundhouse and reclaiming areas . . . the Southeast corner of the power plant . . . was not addressed in the 2001 MDD").

levels exceeding 1,400 ppm be removed to the county landfill. (Heebner Aff. Ex. 8 at 8-9.) The Agency approved, but directed plaintiff to treat soil with lead levels below 1,400 ppm as potentially hazardous. The following summer, the Minnesota Department of Health conducted a health assessment for the site. Its report, issued August 5, 2003, concluded the 1,400 ppm lead level was too high even for industrial and commercial use. It recommended remediating the entire site to 700 ppm, consistent with the risk-based assessment guidelines.

Upon further consideration, the Agency apparently decided its previously established "permanent" 1,400 ppm lead level was not permanent after all. Over the next few years, without amending the 2001 Decision Document, the Agency imposed a new 700 ppm lead cleanup goal for all new construction at the site.

The first construction project subject to the new standards occurred in October 2003. At that time, plaintiff permitted Ferrellgas, a propane gas company, to build a railroad spur on the property. The Agency required plaintiff to remediate all excavated soil to a level of 700 ppm. In the spring of 2005, in connection with another project, plaintiff again had to remediate excavated soil to 700 ppm. Finally, in 2006, in an effort to get the property removed from the State Superfund List, plaintiff did further testing and investigation. The 2006 investigation revealed an area of lead contamination exceeding 1,400 ppm, which had

7

apparently been missed by BNSF in its 2001 cleanup.[4]  Again, the Agency required 700 ppm soil remediation.

Plaintiff, having done this remediation, now seeks to impose costs on BNSF.  On December 21, 2006, plaintiff sought the Agency's authorization to recover costs from BNSF for all three response actions pursuant to MERLA, Minnesota Statutes § 115B.17, subd. 12. The Agency authorized cost recovery in July 2008.

Plaintiff sued BNSF on November 25, 2008, seeking a declaratory judgment, reimbursement of response costs and attorney's fees under MERLA, and damages for nuisance, trespass, waste, and violations of the Minnesota Environmental Rights Act.

While this action was pending, in the fall of 2009, the Agency issued a draft amendment to its 2001 Decision Document which required remediation of the soil to 700 ppm.  See Heebner Aff., Ex. 27.  BNSF objected to the amendment, arguing the 1995 negotiated site-specific cleanup level of 1,400 ppm was sufficient.  The document is not yet published in final form.

II. Analysis

BNSF moves for summary judgment, arguing this matter is barred by the statute of limitations.

Summary judgment is appropriate when the evidence, viewed in

---

[4]All parties seem to agree the failure to remediate this area was simply an error or an oversight.  Apparently, no party considers it to be other than an artifact, which does not impact this decision.

the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49.

The parties agree: a six-year statute of limitations applies to all claims. See Minn. Stat. §§ 115B.11, 541.05 (2008). Accordingly, plaintiff's claims are barred if they accrued prior to November 25, 2002.

### A. Nuisance, Trespass, Waste, and Violations of the Environmental Rights Act

Plaintiff's claims for nuisance, trespass, waste, and violations of the Minnesota Environmental Rights Act, Minn. Stat. § 116B.01-13 (2008) are subject to Minnesota's general six year statute of limitations. See Minn. Stat. § 541.05 (2008).

A fair review of these claims in plaintiff's complaint shows its alleged property damage was either "caused or contributed to" by defendant's release of hazardous substances. As such, these claims fall under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") discovery rule set forth at 42 U.S.C. § 9658 (2005).

Under this rule, claims accrue on "the date the plaintiff knew (or reasonably should have known)" the injury was "caused or

9

contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4). The federal statute expressly preempts state accrual rules in environmental cases, even in the absence of a CERCLA claim. See <u>Tower Asphalt, Inc. v. Determan Welding and Tank Service, Inc.</u>, 530 N.W.2d 872, 875 (Minn. Ct. App. 1995); <u>Soo Line R.R. Co. v. B.J. Carney & Co.</u>, 797 F. Supp. 1472, 1487 (D. Minn. 1992).

In light of CERCLA's mandate, the Court finds these claims are time barred. Plaintiff knew, long before November 25, 2002, that BNSF's operations had resulted in the presence of lead contamination on the property. Plaintiff does not dispute this fact. Instead, it argues it suffered additional, continuing damages. The Court holds this argument does not preserve its claims.

Plaintiff would analogize this case to <u>Lhotka v. United States</u>, where the Eighth Circuit Court of Appeals found a genuine issue of material fact as to when plaintiffs' nuisance and trespass claims accrued. <u>Lhotka v. United States</u>, 114 F.3d 751, 753 (8th Cir. 1997). The analogy is inapt. <u>Lhotka</u>'s statute had a similar accrual rule: "the claim accrues when the plaintiff knows or reasonably should know both the existence and the cause of the injury." <u>Id.</u> (internal quotation omitted). There, the U.S. Fish and Wildlife Service constructed dikes which caused abnormal flooding on plaintiffs' land. The Eighth Circuit determined that,

although the dikes were built in the fall of 1992, plaintiffs might not have been aware of the injury until flooding occurred the following summer, raising a question of fact as to when the claim accrued.  Id.

Plaintiff's reliance on Lhotka is misplaced.  Unlike Lhotka, here, plaintiff knew long before November 2002 - indeed, it knew when it purchased the property in 1992 - that BNSF had deposited contaminants on the property, and that they remained present in the soil.  Plaintiff advances another argument touching the "injury" it discovered; it suggests its present injury is not the presence of contaminants, but rather BNSF's refusal to comply with its 2003 request for further remediation.  It also suggests the remaining lead contamination continues to depress the value of its property, resulting in a lost sale in 2006.

The Court is unpersuaded.  Generally, a claim accrues "when the plaintiff can allege sufficient facts to survive a motion to dismiss for failure to state a claim upon which relief can be granted."  Antone v. Mirviss, 720 N.W.2d 331, 335 (Minn. 2006).  For limitations purposes, damages accrue "upon the occurrence of any compensable damage, whether specifically identified in the complaint or not."  Id. at 336.

Here, plaintiff's claims for nuisance, trespass, waste, and Environmental Rights Act violations all involve damages due to lead contaminated soil on the property.  Plaintiff does not deny it knew

11

of long-standing contamination well before its property purchase, more than six years prior to filing this lawsuit.

Minnesota does recognize continuing trespass and continuing nuisance "when a recurrence of conduct or injury is involved." Union Pacific R.R. Co. v. Reilly Indus., Inc., 4 F. Supp. 2d 860, 866 (D. Minn. 1998) (Doty, J.) (collecting cases). This, however, is not a "continuing" case. Certainly, BNSF once deposited contaminants on the land, but it has not done so for over 30 years. Contamination is a permanent condition until remediated, rather than a continuing tort, and the continuing presence of contaminants "is insufficient to constitute a recurring damage." Id. at 867. The contamination continues as an issue, but this is not at all the same as a recurring behavior, each event of which begins a new limitations period.

The Court also recognizes that accepting plaintiff's argument would let the property owner - rather than the legislature - define the limitations period. The owner would do so simply by asking the prior owner to take some environmental action; thus, re-starting the limitations period, rendering the limitations statute meaningless. Plaintiff cites no authority allowing a claim to accrue in this fashion.

Accordingly, plaintiff's claims are barred by the six year limitations period. Plaintiff knew of BNSF's pollution, the cause of its alleged injury, when it acquired the property.

B.  <u>Minnesota Environmental Rights and Liability Act Claims</u>

MERLA is modeled after the federal CERCLA statute, governing liability, cleanup, and damages for pollution caused by the release of hazardous substances.  <u>See</u> Minn. Stat. § 115B.01-51 (2008); <u>Westling v. County of Mille Lacs</u>, 581 N.W.2d 815, 817 n.1 (Minn. 1998).  The Act imposes strict liability upon those responsible for release of hazardous substances, making them jointly and severally liable, for "all reasonable and necessary removal costs" incurred.  Minn. Stat. § 115B.04 subd. 1.

At the Agency's direction, plaintiff was required to incur costs necessary to remediate the soil lead level from 1,400 ppm to 700 ppm.  It now seeks those costs from BNSF.  The statute provides such an action "may be commenced any time after costs and expenses have been incurred but must be commenced no later than six years after initiation of physical on-site construction of a response action."  Minn. Stat. § 115B.11 subd. 2.

Only the Minnesota Court of Appeals has addressed this statutory text.  It concluded the language meant an action for MERLA costs accrued "at the time of on-site construction of a permanent response action."  <u>State of Minnesota by Hatch v. Employers Ins. of Wausau</u>, 644 N.W.2d 820, 830 (Minn. Ct. App. 2002).  For limitations purposes, "'construction' means actions taken after the selection of remedial action such as excavation, building of structures, installation of equipment or fixtures, and

13

other physical actions to respond to a release or threatened release." Minn. Stat. § 115B.11 subd. 1.

The Court must, therefore, ask whether "physical on-site construction of a permanent response action" began prior to November 25, 2002, at the Brainerd Car Shops. If so, plaintiff's action is time-barred.

BNSF claims the Agency's Decision Document defined a "permanent response action," and the statute started running when it executed its cleanup in compliance therewith. The Court does not agree. The Court recognizes the Decision Document terms the cleanup plan as "final," and the Agency previously said the Decision Document's lead levels would "be in effect permanently." That having been said, the Agency remains the entity with the authority to establish the "permanent" remedy for the site, and it is free to change its mind. As the Agency representative testified:

> Once a responsible party in the Superfund program, always a responsible party. If, in fact, cleanup numbers go down after the fact, after remedial action has occurred, and if the land use changes and the site becomes reactivated for some reason, there can be further cleanups.

(See Rule 30(b)(6) Deposition of Douglas Beckwith, September 23, 2009, at 40, 59-60, attached as Ex. 29 to Heebner Aff.)

Here, notwithstanding BNSF's compliance with the terms of the Decision Document, the Agency subsequently opted for a 700 ppm lead standard. The Decision Document, itself, contemplates such a

14

change when it said BNSF remains solely responsible for the contamination, and may be liable for future cleanup. (See MDD at 1, 5.) Accordingly, the Court finds the Decision Document did not establish a permanent response action or start the limitations period.[5]

BNSF next asks the Court to find that physical on-site construction of a permanent response action occurred no later than the summer of 2002. This was when plaintiff was required to remediate soil excavated in connection with the City of Brainerd's street and utility project. In the summer of 2002, plaintiff was actually required to do some remediation, for which it now seeks reimbursement.

BNSF's argument is unavailing. The Court finds the 2002 remediation was not "permanent," because at the same time plaintiff was doing its remediation, the Agency was in the process of changing its mind, and changing standards are inconsistent with a permanent remedy. The Agency kept the 1,400 ppm lead level for the

---

[5] The Court also bears in mind MERLA's remedial purpose. BNSF polluted this property. It bears the duty of remediating it. The responsible agency, here, the MPCA, is entitled to set the cleanup standard, and to modify it. The goal is to provide for a safe environment, and safety standards can change over time. MERLA's statute of limitation was revised with an eye toward making it easier, not more difficult, for private parties to voluntarily clean up sites and recover response costs. It would be fundamentally inconsistent with this objective, as well as the objective of limitations statutes in general, if the limitations period started running before plaintiff's claim accrued - that is, before plaintiff incurred any response costs.

2002 remediation, but also required plaintiff to manage less contaminated soil, with no representation that this was as low as the level would go.

And in fact, the Agency did not stop with the levels applied to the 2002 street and utility project. Beginning in 2003, after receiving the August 2003 Department of Health report, the Agency mandated soil lead levels of 700 ppm. As a direct result, plaintiff incurred additional response costs in 2003, 2005, and 2006, all within six years before the complaint was filed.

In response to BNSF's motion, plaintiff offers evidence from which a reasonable jury could find that physical on-site construction of a permanent response action began in October 2003. This was the first time the Agency required plaintiff to remediate the soil to the current level of 700 ppm. The date is well within the six year statute of limitations, and as a result, BNSF's motion for summary judgment must be denied as to plaintiff's MERLA claims.

Plaintiff urges the Court to address other questions of first impression in Minnesota; for example, whether the statute starts anew for each response action, or whether it is tolled until the Agency adopts a truly permanent remedy for a site. Because the Court need not reach these questions to decide the motion, it declines to do so.

III. Conclusion

For the foregoing reasons, defendant's motion for summary judgment [Docket No. 17] is denied as to plaintiff's MERLA claims, and granted as to all other claims.

IT IS SO ORDERED.

Dated: July 13, 2010

s/ James M. Rosenbaum<br>JAMES M. ROSENBAUM<br>United States District Judge